Turner, J.
The revisory jurisdiction of this court is limited to determining whether the decision of the Board of Tax Appeals is reasonable and lawful or unreasonable or unlawful. Section 5611-2, General Code.
While the Tax Commissioner questioned the decision of the Board of Tax Appeals in proceedings before that board, no cross-appeal has been filed here and, therefore, our consideration will be limited to the questions raised by appellant, i. e., whether the results reached by the board in its decisions are unlawful or unreasonable in their effect upon appellant.
Under Section 5389, General Code, the depreciated book value of personal property is to be considered for the purposes of taxation unless the assessor shall find that such depreciated book value is greater or less than the true value of such property in money.
Counsel for appellant have built their argument around this section of the code. Yet a diligent search of the record, including exhibits, fails to disclose a scintilla of evidence of book value or depreciated book value except as to the value of movables which are not in question. On the contrary, the testimony of appellant’s assistant comptroller definitely discloses that in appellant’s tax returns for the years 1938,1939 and 1940, the book value and book depreciation of appellant’s machinery, engines, tools and equipment *78 were not used (with the exception of what are known as movables in two of the plants). Appellant’s assistant comptroller also testified that no change was made in appellant’s bookkeeping- records after the 1937 appraisals hereinafter referred to were made. That book value and book depreciation were not used in making- its returns or in the appraisal was made clear by the testimony of appellant’s first witness before the Bdárd of Tax Appeals who testified: “A. In arriving at these figures we have set down we didn’t attempt to set up any percentage of depreciation for any particular year. Rather we considered’ the value of the machinery and equipment on its individual merits at’ that time. * * * "We aimed at a dollar result rather' than a percentage result.”
Instead of returning depreciated book value, an appraisal was made by appellant’s employees in 1937, and the values thus arrived at were used by appellant in its return. For each succeeding year appellant deducted five-per cent from the 1937 appraisal values. In such appraisals ‘items which had reached twenty years-of age were-given no value although they were' still in the production line and being used. A large amount of costly machinery and equipment in regular use was givén values equal to from 5 per cent to 25 per cent of its cost notwithstanding- such machinery and equipment were being used in the production line. The record shows that - all this personal property was being maintained by repairs and replacements of worn parts. '
The method of appraisal of the Steubenville works, which may be taken as typical of the others, was set out by appellant’s witness as follows:
“It was done by myself and other members of the engineering staff 'Working under my direction and supervision. We listed all machinery, tools and equipment in the Steubenville plant and obtained the cost *79 of this equipment from our records, and in such cases where no records were available and the machinery was too old we estimated the cost to the best of our ability. We then examined all of the machinery and equipment to determine its physical condition. We considered each item of equipment in its relation to one operation or one department and its value in this operation. We considered its physical value and how long it would last. We considered whether it would have to be replaced in the near future. We considered how much the operation of the department would affect the value of the particular machine.”
In further elaboration of method, this same witness testified: “In general we considered its physical condition, how long we thought it- could be used, when it would have to be replaced, and the most important of all its obsolesence, which was being brought on by consumer demands and lower cost requirements in order to meet our competition.”
It is, therefore, clear that the values returned by appellant for the years 1938, 1939 and 1940, were not book values less book ■ depreciations and, therefore, we may dismiss the provisions of Section 5389, General Code, without further comment.
However, outside of what might loosely be called a prima facie case established by the listing of book value less book depreciation, the treatment here of the valuation by appellant will be the same for the reason that the Tax Commissioner had the power under the statutes to exercise a revisory jurisdiction in either case. Likewise the Board of Tax Appeals’ jurisdiction to affirm, reverse, vacate or modify the tax assessment is the same. Depreciated book value as used in Section 5389, General Code, means the cost price of the personal property acquired including the cost of installation entered on the books of the company in the ordinary course of business, less the depreciation set *80 up ou the.books; in a.regular and. consistent manner for reflecting;:such .depreciation (including a reasonable allowance for: obsolescence).
■ There are-different methods for setting up book depreciation, .the most widely used of which is what is known, as , the straight line depreciation. Since the adoption of .the Federal Income Tax Law, accounting practice follows closely the treasury regulations. In Bulletin “F” (Revised January 1942) United States Treasury Department, Bureau of Internal Revenue, Income Tax,. Depreciation and Obsolescence Estimated Useful Lives and Depreciation Rates, various methods and rates for computing the allowance for depreciation and obsolescence are discussed and set up. See, also, Accountants’ Handbook (1943) page 765 et seq.; Auditing Theory and Practice by Montgomery, page 317 et seq.; The Fundamentals of Accounting by William Morse Cole, pages 126, 301; General Accounting, page 266 (Finney).
Complaint is made of the use of the method of depreciation known in the Department of Taxation as “302 Computation” which appellant states in its brief “was employed generally by the commissioner in assessing all kinds of manufacturing equipment.”
The record shows that this was the method used by the Tax Commissioner in testing the valuation of machinery and equipment used in the steel industry. This computation involves a listing of the cost of each piece of machinery according to the year of its installation and then depreciating it at the rate of 2% per cent for the first year and 5 per cent for each ensuing year of its existence from the year of its installation. However, depreciation was halted at 30 per cent of cost except as to machinery twenty or more years old which was depreciated to 20 per cent of cost.
These percentages were applied by the Tax Commissioner only to machinery and equipment in the pro *81 duction line, i. e., machinery and equipment which were being used.
So far as the record in this case discloses, we see no-reason for criticism of the application of the so-called “302 Computation” especially as the evidence shows and as appellant admits, it is applied generally to all taxpayers in similar situations. Of course, situations may arise where, such computation would not be proper. Comparing the “302 Computation” with the average life tables for the iron and steel industry used by the United States Treasury Department, Bureau of Internal Revenue (See Bulletin “F”, revised January 1942, page 41), the “302 Computation” is the more favorable to the taxpayer. Percentage depreciation is used almost universally in industry and in accounting. Appellant used a five per cent depreciation for each succeeding year after its 1937 valuation.
Section 5375, General Code, provides:
“In assessing taxable property the assessor shall be governed by the rules of assessment prescribed by this chapter. Wherever any taxable property is required to be assessed at its true value in money or at any percentage thereof, the assessor shall be guided by the statements contained in the taxpayer’s return and such other rules and evidence as will enable him to arrive at such true value. * * *” (Italics ours.)
Under Section 5376, General Code, the Tax Commissioner is the assessor of the personal property in question. This section provides that the Tax Commissioner :
“* * * shall assess all taxable property as defined in this chapter and shall list and assess all such property which is not returned for taxation and for that purpose shall have and exercise all powers whatsoever in it [commissioner] vested by any provision of law for any purpose relating to any other law which the commission [commissioner] is required to administer. *82 The action of the assessor in assessing taxable property under this chapter shall be taken with respect to the taxable property required to be listed in a return, whether so listed or not, and whether such return has been made or not. * * *” (Italics ours.)
Section 5395, General Code, which authorizes the Tax Commissioner to make final assessments provides: “For such purpose the commissioner may utilize all facts or information coming- to his knowledge or which he may acquire by the exercise of powers vested in him by law # * V’
Sections 5377 and 5395, General Code, authorize the Tax Commissioner to make corrective assessments and the latter section also gives the taxpayer the right of appeal to the Board of Tax Appeals.
Section 1464-2, General Code, provides in part:
“The Board of Tax Appeals and the Tax Commissioner shall have the following powers, duties, privileges and immunities of the Department of Taxation:
■“1. All powers whatsoever of an inquisitorial nature as provided by law, including, among- others, the right to inspect books, accounts, records and memoranda ; to examine persons under oath; to issue orders or subpoenas for the production of books, accounts, papers, records, documents and testimony; * * V’
Section 1464-3, General Code, prescribing the powers, duties and functions of the Tax Commissioner, provides in paragraph 9:
“To make all tax assessments, valuations, findings, determinations, computations and orders which the Department of Taxation is by law authorized and required to make, excepting, however, such tax assessments, valuations, findings, determinations, computations and orders which the Board of Tax Appeals is by law authorized and required to make; and, pursuant to’time limitations now'provided by law, on his owTn motion, to review, redetermine or correct, any tax *83 assessments, valuations, findings, determinations, computations or orders which he. shall have made, provided, however, that he shall not review, redetermine or correct any tax assessment, valuation, finding, deter-' mination, computation or order which he shall have made as to which an appeal or application for rehearing, review, redetermination or correction shall have been filed with the Board of Tax Appeals, unless such appeal or application is withdrawn or dismissed by the appellant or applicant; * * *.
“13. To adopt, and to promulgate in the manner provided by this act, all rules of the Department of Taxation other than the rules which the Board of Tax Appeals is by Section 1464-1 of the General Code, authorized and required to adopt and promulgate.”
Section 1464-1, General Code, authorizes the Board of Tax Appeals to hear and determine applications for review of rules adopted and promulgated by the Tax Commissioner.
Section 1464-4, General Code, provides in part:
“Applications for review of any rule adopted and promulgated by the Tax Commissioner, as herein provided, may be filed by any person with the Board of Tax Appeals. Such applications shall allege that the rule complained of is unreasonable and shall state the grounds upon which such allegation is based.”
The “302 Computation” as we understand from the record and argument in this case is a rule adopted by former Tax Commission and carried over under the provisions of Section 1464-4, General Code. While it has not been duly promulgated and filed, we are of the opinion that the use of such rule in the instant cases is within the powers delegated to the Department of Taxation.
As said by Chief Justice Marshall in the case of Floyd, Aud., v. Manufacturers Light & Heat Co., 111 Ohio St., 57, 80, 144 N. E., 703:
*84 “This court will not attempt to define all of the elements which may properly enter into the valuation of the property as a whole, believing that the experience of the Tax Commission and its facilities afford it the ability to make rules, in which we can render no valuable aid.” See, also, Schumacher Stone Co. v. Tax Commission, 134 Ohio St., 529, 18 N. E. (2d), 405, 120 A. L. R., 1199.
As stated by Judge Matthias at page 498 in the case of State, ex rel. Maxwell, Pros. Atty., v. Schneider, 103 Ohio St., 492, 134 N. E., 443:
“The action of a public officer, or of a board, within the limits of the jurisdiction conferred by law, is not only presumed to be valid but it is also presumed to be in good faith and in the exercise of sound judgment.” See, also, Reynolds v. Schweinefus, 27 Ohio St., 311.
This rule is stated in 20 American Jurisprudence, 174, Section 170, as follows:
“In the absence of any proof to the contrary, there is a very strong presumption embodied in the maxim *omnia praesumuntur rite esse acta/ that public officers have properly discharged the duties of their office and performed faithfully those matters with which they are charged.”
In 38 Ohio Jurisprudence, 1001, Section 236, it is said:
“No court can, in the first instance, place values for the purpose of taxation on any property whatever. In fact, the valuation of property for the purpose of,tax levies' is ministerial and administrative in character, * * # >?
While not necessary to apply here, it is interesting, nevertheless, to note the following by Cooley: “As a general rule, a tax cannot depend for its validity upon the ability of those who lay it to make plain its justice to the satisfaction of court or jury. Value is matter of opinion, and when the law has provided officers upon *85 wliom the duty is imposed to make the valuation, it is the opinion of those officers to which the interests of the parties are referred. The court cannot sit in judgment upon their errors, or substitute its own opinion for the conclusions the officers of the law have reached.” 3 Cooley Taxation (4 Ed.), 2299, Section 1144.
At page 2293, Section 1138, ibid, it is said:
“The assessor, in valuing property, must apply his own knowledge and exercise his own judgment. He need not hear evidence. Statutes enumerating the sources of information whence the value is to be ascertained are generally directory and not mandatory. ’ ’
At page 2182, Section 1073, ibid, it is said:
“There is a rebuttable presumption that assessing officers have performed their duty and that the assessment is correct.”
As held by this court in the case of American Steel & Wire Co. of New Jersey v. Board of Revision of Cuyahoga County, 139 Ohio St., 388, 391, 40 N. E. (2d), 426, true value is a question of fact to be determined by the taxing authorities.
It is contended by appellant that the Tax Commissioner’s assessments were void ab initio. However, this claim is based principally upon provisions of Section 5389, General Code, in respect of book value and book depreciation and loses sight of the presumption of validity already referred to. Even though book value and book depreciation had been used in this case, the Tax Commissioner had the right and duty to make an investigation to see whether appellant’s figures should be accepted and if appellant’s figures did not reflect true value in money to make the necessary correction.
It is then contended by appellant that there is no evidence on behalf of the Tax Commissioner in the record before the Board of Tax Appeals. We think this claim is entirely erroneous.
The Board of Tax Appeals recited in its respective *86 journal entries that the “cause carne on to be heard by the Board of Tax Appeals and was submitted on the transcript of the proceedings before the Tax Commissioner, the evidence offered and introduced on the hearing of the case and on the briefs of counsel.”
Appellant introduced Exhibits 9 ■ to 12, inclusive, which are the work sheets compiled by the Tax Commissioner’s auditors from the inventory and data furnished by appellant’s engineers and assistant comptroller. In addition, appellant introduced the copy of its appraisals, the information from which was used by the Tax Commissioner in making his assessments. And further, appellant called as a witness one of the auditors of the Tax Commissioner and went into the method followed in making the assessments. Both the commissioner and the board used appellant’s own list of its personal property and accepted the cost and age as furnished by appellant.
From an examination of the record we are of the opinion that the provisions of Section 5611, General Code, requiring the Tax Commissioner to certify to the Board of Tax Appeals a transcript of the record of the proceedings before him together with all evidence, documentary or otherwise, considered by him in connection therewith, have been substantially complied with.
In discussing the acts of the Tax Commissioner we have but followed the line of argument offered by appellant. However, the real question here is whether the decision of the Board of Tax Appeals is reasonable and lawful. (Section 5611-2, General Code.)
As shown by the record and appellant’s brief, the Board of Tax Appeals reduced the valuations made by the Tax Commissioner in all of appellant’s plants except the Martins Ferry factory. In respect of the assessment of the Martins Ferry factory the Board of Tax Appeals made the following finding:
*87 ‘ ‘ The Board further finds that the appellant in making its appraisal of the Martins Ferry plant appraised only equipment twenty years old. That all equipment twenty years old or older was completely depreciated and considered of no value and not even listed though still in use in the production line. Appellant’s own witness testified that said plant was started in 1907 and that the majority of the equipment had a life greater than twenty years. In making thé assessment the same list of equipment was used as appellant used in its appraisal. Therefore, all the equipment in said plant twenty years old or older was totally excluded from the assessment. Said equipment certainly is of some value so long as it is still in use in the production line in said plant. There is no evidence in the record indicating what said equipment is, whéther it represents a small portion or a large portion of the equipment in said plant. Under these circumstances there is no possible way for this board to determine the value of all the equipment in said plant. It is, therefore, ordered that the assessment as to the engines,' machinery, tools and equipment in the Martins Ferry plant be and the same hereby is affirmed.”
Appellant’s witness in charge of the Martins Ferry appraisal took into consideration whether the equipment was liable to become obsolete for any reason. This plant was started in 1907. Appellant’s witness believed that practically all of it was depreciated at the rate of 5 per cent. This witness stated:
“In the majority of machinery in the Martins factory obsolescence does not enter into it with any great extent. The machinery there is largely punch presses, shears and machinery of that type. That type of equipment does not become obsolete due to improvements in design.”
This witness stated several times that no value was *88 assigned to any machinery or equipment more than twenty years old.
Appellant’s exhibit with the inventory of the Martins Ferry plant does not contain any item more than twenty years of age. This is clearly and repeatedly stated by appellant’s witness. No consideration was given by this witness as to whether the price of the same article purchased at the present time would be higher than the original cost. This witness stated that he had known presses which were thirty years old or older still operating. He also said that he was instructed not to go back beyond twenty years.
At the time of the appraisal some of the machinery in the Martins Ferry plant was depreciated 95 per cent so that in the ensuing year after the appraisal year no valué whatever was given to such property. The witness was unable to state how much of the equipment in the Martins Ferry plant had been omitted.
In answer to a question by the chairman to this Martins Ferry witness: “Q. Didn’t you say the majority of it would have a life of over twenty years ? ”; he replied: “A. I did, sir. Taking into consideration all types, whether it has a very short life or a long life, the majority of equipment to which I assigned a twenty-year life, probably has a greater life than twenty years. * * *
“Chairman: You testified you kept the plant in pretty good condition. In other words, your maintenance and repair is kept pretty well up to date, is that right? A. That’s true.”
From our study of the record in this case we are of the opinion that the decision of the Board of Tax Appeals affirming the assessment of the Martins Ferry *89 plant by the Tax Commissioner was reasonable and lawful and should be affirmed.
As to the other works, while the Tax Commissioner for the year 1938 assessed the Steubenville works at $3,485,289, the Board of Tax Appeals modified the valuation to $3,437,414.05, and proportionate reductions were made for the ensuing two years.
The Yorkville works were assessed for 1938 by the Tax Commissioner at $1,321,570, while the Board of Tax Appeals modified this figure to $1,315,764.55.
For the year 1939 the Tax Commissioner assessed the Yorkville works at $4,632,558, while the Board of Tax Appeals modified that assessment to $4,494,218.48, with a similar modification for 1940.
The Tax Commissioner assessed the Portsmouth works for 1938 at $2,067,429, while the Board of Tax Appeals modified that valuation to $1,814,241.08.
Our remaining questions then concern the decisions of the Board of Tax Appeals in respect of the Steubenville, Yorkville and Portsmouth works. To go minutely into the record in this case would take entirely too much space in this already long opinion. Therefore, it will be necessary to confine ourselves to a few of the glaring instances which show that the Board of Tax Appeals decisions did not and could not prejudice appellant.
Appellant introduced one of its employees, R. B. Smith, who testified that during the years 1937, 1938 and 1939, he was in charge of disposing of discarded equipment and that there was always a market for such equipment. This witness was asked by counsel for appellant whether he had attempted to sell cranes to which he responded: “We leave cranes out of it. The motors, drives, the particular units we discarded we *90 had no further use. Cranes are always useful in any steel mill.”
And again Mr. Smith stated: “We have never sold what is known as a travelling overhead electric crane. I would like to have several more right now.”
No question is raised as to the successful operation of the Steubenville works and yet appellant’s own exhibits show that 27 cranes, nearly all of which are definitely marked “electric overhead travelling cranes” which cost according to the exhibit, $168,032, were depreciated 90 per cent in the 1937 appraisal and 5 per cent additional was taken off for each of the succeeding years until they appeared in the 1940 return at no value whatever.
In the same plant five electric overhead travelling cranes costing $88,904, were depreciated 80 per cent in the-1937 valuation, while 15 other cranes in the same plant costing $169,230 were depreciated 75 per cent in the 1937 appraisal and 5 per cent additional for each succeeding yeár.
In another exhibit we find eleven electric overhead travelling cranes depreciated 95 per cent in the valuation of 1937, which means, of course, that in the succeeding year there was no value given by appellant to these cranes.
On a single page of the Portsmouth plant inventory three overhead cranes costing $30,950 were given no value, while on another page an overhead crane costing $9,121 and one costing $12,657.35 were also given no value'. On the following page of the exhibit we find three cranes costing something over $21,000, given no value. Ón a later page of the exhibit we find a 25-ton overhead crane costing $12,000, given no value. Other cranes throughout these various works were depreca at- *91 ed in the 1937 valuation from 50 per cent to 95 per cent.
In the Portsmouth works appellant’s exhibits show that the total cost of the machinery and equipment was $6,503,179.79, which appellant appraised at $381,657.24-for 1938, and this, notwithstanding appellant’s evidence shows that more than $1,000,000 was expended in rehabilitating this plant in a preceding year.
. Most of the pages pf the Portsmouth exhibit show that a majority of the items listed thereon were given no value.
Referring to a sample page we find the following:
. One Lima 57-ton locomotive, cost $6,000, given no value.
One Baldwin 75-ton locomotive, cost $21,258, given no value.
One 57-ton Lima locomotive, cost $10,600, given no value.
One American 48%-ton locomotive, cost $15,550, given no value.
One American 81%-ton locomotive, cost $15,480, given no value.
. One Porter 71-ton locomotive, cost $50,000, given no value.
One Porter 71-ton locomotive, cost $51,315, given no value.
One locomotive crane costing $6,500, given no value.
One locomotive crane costing $7,905, given no value.
One locomotive crane costing $7,905, given no value.
102 steel hopper cars — 110,000-lb. capacity, cost $285,600, given no value.
5 Brunswick hopper cars, cost $15,000, given no value.
10 steel gondolas — -100,000-lb. capacity, cost $30,000, given no value.
*92 8 steel side dump cars, 30 cu. yd. cap., cost $36,123, given no value.
3 wood dump cars costing $6,000, given no value.
6 flat cars for slag, cost $6,000, no value.
1 wooden side gondola, 25,000-lb. capacity, cost $500, given no value.
1 steel flat car, cost $800, given no value.
4 steel hopper cars for barrel scrap, cost $11,200, given no value.
3 steel hopper cars for coke dust, cost $3,200, given no value.
2 steel gondolas for construction dept., cost $1,100, given no value.
2 steel gondolas, 100,000-lb. capacity, cost $5,600, given no value.
1 wooden flat car, 100,000-lb. capacity, cost $1,000, given no value.
1 steel scale test car, cost $400, given no value.'
Total general yard equipment costing $709,208.46, was given a value of $33,925.75.
Appellant’s exhibits show the cost of the by-product coke department of the Portsmouth works, machinery and equipment, to be $753,335.03. This was given a present value in 1937 of $7,898.80.
The cost of the blast furnace department machinery and equipment was $419,559.44, -to which appellant gave a present value in 1937, of $24,458.67.
In the open hearth department the cbst of machinery and equipment was shown at $727,994.34 and appellant gave a present value in 1937 of $97,026.58.
In the Yorkville works exhibit twelve cranes were depreciated 90 per cent in the 1937 valuation. In the same plant the total depreciation of machinery and equipment at December 31, 1938, was 59 per cent while at December 31, 1939, the depreciation *93 was 64 per cent and as of December 31, 1940, the total depreciation on cost was 66 per cent.
It is difficult indeed to understand how any successful plant could be run in competition with machinery and equipment only approximately one-third efficient.
As of December 31, 1937, appellant’s exhibits show the cost of the Steubenville works machinery and equipment to be $6,861,979 with a then present value of only $2,694,147, approximately 39 per cent. From this present value, 5 per cent additional was taken off in each of the succeeding years with the result that at December 31, 1939, the cost value was $7,222,214 while the value as reported for taxation was $2,634,841, approximately 36 per cent.
As to the Yorkville plant, appellant’s appraiser said the primary fact considered was what they “thought would be the remaining life, the remaining number of years of usefulness of that equipment to us at York-ville.”
Appellant’s witness testified that a tandem mill which had been installed in 1934 was depreciated 30 per cent and this notwithstanding the fact that a similar new twin mill was thereafter added and completed in May 1938. The witness admitted that on this new mill a 50 per cent depreciation was taken in the first year. His reason for this was:
“Yes, we did that because we felt and we still feel, in fact more strongly now, because developments that have taken place between then and now, this machinery will not be competitive from an economic standpoint many more years.”
Both of these mills were still in use at the time of the hearing.
In the Yorkville plant as already pointed out, there were a number of electric overhead travelling cranes *94 depreciated 90 per cent in the 1937 valuation. As of December 31, 1938, appellant’s exhibits show that thépersonal property at that'plant cost-$5,641,714.56, but was returned for taxation at only 41 pdf '-cent thfere'of or $2,308,489. As of December NI, 1939,¡'-the cost-was $5,675,031.56, it was returned at 36 per cent of this valuation or $2,073,573. As of December 31, 1940* the-cost was $5,943,270.01, which was returned for taxation at 34 per cent or $2,030,500. An' instance of another successful plant claimed to be running with its machinery approximately two-thirds worn out.'
The foregoing itemization of excessive depreciation or no value at all of property listed by appellant m the various plants is far from exhaustive but it- illustrates sufficiently the quality of appellant’s appraisal and returns for taxation.
There is no such situation! presented in the instant' case as was presented in the case of Morgan v. United States, 304 U. S., 1, 82 L. Ed., 1129, 58 S. Ct., 773, where it was held in substance that the right to a “.full hearing” in a ^MO-sá-judicial proceeding conducted by' an administrative agency embraces not only the right to present evidence but also a reasonable opportunity to know the claims of the opposing party .and to meet them.
In the instant case full latitude was allowed appellant in the presentation of its evidence. Appellant knew from the final assessment what-had been done by the Tax Commissioner, i. e'., the valuation which the appellant had to meet. Appellee’s auditor was placed on the witness stand by appellant and not- a single objection was' offered to any question asked him;' "The witness was not shown to be hostile or unfair and there was, therefore, no basis for' examining him as upon cross-examination. The same effect' was had by appellant’s examination of this witness as if he had *95 been under cross-examination. His testimony showed that he had used only the property inventory and data furnished by appellant to which was applied the commissioner’s formula for present value of similar personal property.
The big question in these cases which appellant minimizes in its argument is the omission by appellant to return many items of personal property which were being used by appellant in its lines of production. The evidence showed that the Tax Commissioner relied solely upon appellant’s own inventory of its personal property — no assessment was made against any property which was not contained in appellant’s inventory, but assessments were made on property contained in appellant’s inventory for which appellant had returned no value. The work sheets of the Tax Commissioner’s auditors were produced and introduced. At the close of the testimony and after such work sheets had been introduced, counsel for appellant asked:
“I will ask this case be continued; that a time be set by the board for the taking of testimony of Mr. Evatt, the Tax Commissioner, and, or, Mr. Edwards and Mr. White. ’ ’
, The chairman responded: “The case will stand continued to a date to be set by the board for further hearing in Columbus, for the sole purpose of taking-the testimony of William S. Evatt, Tax Commissioner, John S. Edwards, assistant tax commissioner, and J. C. S. White.” While this request was granted in full, no further testimony was offered. However, after the testimony was transcribed, a hearing was set and all that transpired thereat was:
1. The submission of a stipulation of fact in respect of the ingot molds.
2. The correction of the transcript of the testimony *96 and the renewal by appellant of its motion made at the beginning of the hearing that the Board of Tax Appeals state in writing its conclusion of fact separately from its conclusions of law. Appellant tendered a set of written findings of fact and conclusions of law which it requested the board to adopt.
There is no authority for request for findings of fact and conclusions of law separately stated. However, the journal entries of the Board of Tax Appeals substantially comply with this request.
Under Section 1464-1 (7), General Code, the Board of Tax Appeals is required to keep a journal which shall be open to public inspection and in which it shall keep a record of all of its proceedings and the vote of each of its members upon every action taken. The record in this case shows compliance with this law as there is a journal entry in each case disclosing the findings of the board and the reasons therefor.
Appellant claims that the decisions of the Board of Tax Appeals deprive appellant of its property without due process of law, contrary to the Fourteenth Amendment to the Constitution of the United States.
Appellant has failed to point out wherein the board’s decision or that of the Tax Commissioner was due to a purposeful discrimination of any kind. Indeed appellant’s own evidence and argument disclose that all taxpayers similarly situated are treated alike.
As stated by Mr. Chief Justice Stone in the case' of Snowden v. Hughes, 320 U. S., —, 88 L. Ed., 347, decided January 17, 1944:
“Another familiar example is the failure of state taxing officials to assess property for taxation on a uniform standard of valuation as required by the assessment laws. It is not enough to establish a denial of equal protection that som,e are assessed at a higher *97 valuation than others. The difference must be due to a purposeful discrimination, which may be evidenced, for example, by a systematic under-valuation of the property of some taxpayers and a systematic overvaluation of the property of others, so that the practical effect of the official breach of law is the same as though the discrimination were incorporated in and proclaimed by the statutes, [citing cases] Such discrimination may also be shown to be purposeful, and hence a denial of equal protection, even though it is neither systematic nor long continued.”
We agree thoroughly with the statement of Mr. Chief Justice Hughes at page 22 of the Morgan case, supra:
“The maintenance of proper standards on the part of administrative agencies in the performance of their gwasi-judicial functions is of the highest importance and in no way cripples or embarrasses the exercise of their appropriate authority. On the contrary, it is in their manifest interest. For, as we said at the outset, if these multiplying agencies deemed to be necessary in our complex society are to serve the purposes for which they are created and endowed with vast powers, they must accredit themselves by acting in accordance with the cherished judicial tradition embodying the basic concepts of fair play.”
. Counsel for appellant have sought to minimize the amount of omitted property and the amount of property depreciated 90 per cent or more. However, we have given careful consideration to all of the testimony and all of the exhibits and are convinced that in the modification of the assessments made by the Board of Tax Appeals for the several years of plaintiff’s Steubenville, Yorkville and Portsmouth works are in no way unfair to appellant. We are of the opinion that *98 the Board of Tax Appeals gave due consideration to the progress in the art, which includes new inventions or processes and other items of normal obsolescence, to extraordinary obsolescence, which includes inadequacy to growing needs, and to the question of profits and losses in the different plants as disclosed by appellant’s balance sheet and testimony. We agree with the Board of Tax Appeals in its finding that the molds are not dies and were properly included in the assessment as taxable property. We find no justification in the record for appellant’s claim of a 25 per cent deduction from book value of its inventory for the years 1939 and 1940. We find no abuse of discretion by. the Board of Tax Appeals in any of the appealed cases.
Therefore, upon hearing and consideration of the record and evidence, this court is of the opinion that the decisions of the Board of Tax Appeals appealed from are reasonable and lawful and should be and hereby are affirmed.

Decisions affirmed.

Weygandt, C. J., Matthias, Hart and Zimmerman, JJ., concur.